Exhibit "A"

MTF ADVANCE PLUS
REVOLVING CREDIT AND SECURITY AGREEMENT

Dated as of November 6, 2014

This MTF Advance Plus Revolving Credit and Security Agreement (the "Agreement") is entered by and between Goodman Tank Lines, Inc. (the "Borrower"), and Marquette Transportation Finance, Inc. ("Lender").

ARTICLE I
Definitions

Section 1.01 Definitions. For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)    The terms defined in this Article have the meanings assigned to them in this Article, and include the plural as well as the singular; and

(b)    All accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles.

(c)    "Account" shall mean all of Borrower's freight bills, broker bills and other accounts, however created or evidenced arising from the rendition of services by Borrower together with all contract rights, instruments, documents, chattel paper, notes, drafts and other forms of obligations owing to Borrower related to or evidencing any such Account.

(d)    "Advance" means an advance by Lender to the Borrower pursuant to Article II.

(e)    "Borrowing Base" shall mean ninety percent (90%) of all Qualified Receivables.

(f)    "Collateral" shall mean all present and future Accounts, all of Borrower's other accounts; chattel paper, instruments, payment intangibles, general intangibles, and documents whether or not considered an Account under the terms of this Agreement; all assets including, without limitation, records, inventory, equipment of every kind and description (other than rolling stock consisting of titled tractors and trailers of Borrower); furniture and fixtures; deposit accounts; money; investment property; letters of credit; notes; tax refunds and insurance proceeds, all as defined in the Uniform Commercial Code and all proceeds thereof.

(g)    "Commencement Date" shall mean the date of the first Advance to Borrower under this Agreement.

(h)    "Event of Default" has the meaning specified in Section 7.01.

1

(i)     "Guaranty" means the joint and several (if more than one) guaranty dated of even date herewith of D. Craig Goodman, Goodman Holding Company, Ltd., Goodman Logistics, LLC, and Stowe Leasing, Inc. (hereinafter collectively, if more than one, referred to as "Guarantor"), pursuant to which Guarantor guarantees payment to Lender of the amounts payable by the Borrower to Lender pursuant to this Agreement.

(j)     "Maximum Advance" shall mean One Million Two Hundred Thousand Dollars and No Cents ($1,200,000.00).

(k)     "Net Worth" means the aggregate of capital and surplus of the Borrower, all determined in accordance with generally accepted accounting principles.

(l)     "Obligations" shall mean and refer to all of Borrower's obligations under this Agreement as well as all loans from time to time made by Lender to Borrower or any affiliate and to others at the request of or for the account of or for the benefit of Borrower or any affiliate, all other debts, extensions of credit, liabilities and obligations of Borrower or any affiliate to Lender outstanding at any time, of every kind and description (whether or not evidenced by a note or other instrument and whether or not for the payment of money), direct or indirect, absolute or contingent, joint or several, primary or secondary, due or to become due, now existing or hereafter arising, including, without limiting the generality of the foregoing, any liability of Borrower to Lender or any Affiliate as a guarantor of indebtedness or liabilities of others and all interest, fees, charges and expenses payable by Borrower hereunder, or any supplement or amendment hereto or any other agreement between Borrower or Lender or any Affiliate or any instrument evidencing any of the foregoing.

(m)     "Prime Rate" shall mean the highest of the Prime Rates published in the Money Rates section of The Wall Street Journal as the base rate on corporate loans.  In the event the Prime Rate as published in The Wall Street Journal ceases to exist or The Wall Street Journal ceases publishing a Prime Rate, the holder hereof will substitute a comparable index which is outside the control of the holder.  In the event of an error by The Wall Street Journal, the "Prime Rate" will be based upon the Prime Rate as corrected.

(n)     "Qualified Receivable" shall have the meaning set forth in Section 2.08 hereof.

(o)     "Revolving Loan" shall mean the full amount of all Obligations owing to Lender.

## ARTICLE II
### Amount and Terms of the Revolving Loans

Section 2.01  Revolving Loans.  Lender agrees, in its sole discretion, on the terms and subject to the conditions hereinafter set forth, to make Advances to the Borrower from time to

time commencing on the date hereof and continuing for a period of one year, or the earlier date of termination in whole of the Revolving Loan as provided herein, in an aggregate amount the lesser of the (i) Borrowing Base or (ii) the Maximum Advance. Each Advance shall be in the amount of $1,000.00 or an integral multiple thereof. The Borrower may borrow, prepay subject to the restrictions set forth in Section 8.05, and re-borrow under this Section. This Agreement shall automatically renew each year for an additional one-year period, unless terminated by Lender as provided herein. Borrower shall have the right to terminate this Agreement by providing Lender written notice of its intent to terminate the Agreement sixty (60) days prior to the anniversary of Commencement Date or sixty (60) days prior to each subsequent anniversary of the Commencement Date. Any Advances made by Lender after the date of expiration of the Revolving Loan or any Advance in excess of the Maximum Advance shall be subject to all of the terms and conditions of this Agreement.

Section 2.02 <u>Grant of Security Interest</u>. To secure the payment and performance of each and every Obligation of every type and description which Borrower may now or at any time hereafter owe to Lender, including, but not limited to, its Obligations hereunder, Borrower hereby grants Lender a security interest in the Collateral. Borrower authorizes Lender to record any UCC-1 financing Statements, continuation statements and other instruments which Lender determines are necessary or appropriate to perfect its security interests. Until all Obligations have been fully paid and performed, whether or not this Agreement has been terminated as hereinafter provided, Lender shall have and retain its security interest and lien in and assignment of all Collateral, whether or not any of such Collateral is deemed by Lender to be eligible for loan purposes.

Section 2.03 <u>Making the Revolving Loans</u>. Each Advance shall be made on at least one (1) business day's prior notice from the Borrower to Lender by telephonic request or in writing by any person purporting to be authorized to request Advances on behalf of the Borrower, which request shall specify the date of the requested Advance and the amount thereof; provided that Lender shall use its best efforts to make the requested Advance on the date such request is made provided that Lender receives the written request prior to 11:00 a.m. Central Time (Standard or Daylight as applicable) on any business day. Upon fulfillment of the applicable conditions set forth in Article III, Lender may disburse the amount of the requested Advance in such manner as Lender and the Borrower may from time to time agree. Any request for an Advance, whether written or telephonic, shall be deemed to be a representation that the statements set forth in Section 3.02 are correct.

Section 2.04 <u>Termination or Reduction of the Revolving Loan</u>.

(a)     The Borrower shall have the right at any time and from time to time upon three (3) business day's prior notice to Lender to permanently to terminate the Revolving Loan, subject to Section 8.05 herein.

(b)     Lender may, at any time, with or without cause, and regardless of whether Borrower is in default hereunder, terminate this Agreement and its Revolving Loan to advance funds hereunder upon thirty (30) days written notice to

Borrower. This provision shall not be construed to limit or affect Lender's right to terminate this Agreement and the Revolving Loan immediately in the event of a default, or to otherwise exercise its rights and remedies under Section 7.02 hereof.

Section 2.05  Computation of Interest and Payment of Interest. Borrower promises to pay Lender, at its office in Minnesota or at such other place as may be designated from time to time by the holder hereof, on demand in lawful money of the United States of America, the principal sum of One Million Two Hundred Thousand Dollars (S1,200,000.00) or so much thereof as has been Advanced and remains unpaid at maturity, together with interest as calculated herein commencing on the date hereof until all of Borrower's Obligations are fully paid.    Until all Obligations of Borrower to Marquette are fully paid and performed, Borrower shall pay to Marquette monthly, in arrears, on the first day of each calendar month, accrued and unpaid interest at a rate which shall be equal to the lesser of (i) the sum of the Prime Rate plus three percent (3.0%) or (ii) the Highest rate of interest permitted by applicable state or federal law in effect from time to time in the Applicable Jurisdiction for loans to borrowers of the type, in the amount, for the purpose and otherwise of the kind herein contemplated (hereinafter "Highest Legal Rate").

In no event shall Borrower be obligated to pay interest at any rate exceeding such Highest Legal Rate and all agreements. conditions or stipulations, if any, which may in any event or contingency whatsoever operate to bind, obligate or compel Borrower to pay a rate of interest exceeding the Highest Legal Rate, shall be without binding force or effect, at law or in equity, to the extent only of the excess of interest determined to be at a rate over such Highest Legal Rate. In the event any interest is contracted for, charged or received at any rate in excess of the Highest Legal Rate ("Excess"), Borrower acknowledges and stipulates that any such contract, charge, or receipt shall be the result of an accident and bona fide error, and that any Excess received by Marquette shall be applied, first, to reduce the principal then unpaid hereunder; second, to reduce the other Obligations; and third, returned to Borrower, it being the intention of the parties hereto not to enter at any time into a usurious or otherwise illegal relationship. Borrower recognizes that, with fluctuations in the Prime Rate or the Highest Legal Rate, such a result could inadvertently occur. By the execution of this Agreement, Borrower covenants that (i) the credit or return of any Excess shall constitute the acceptance by Borrower of such Excess, and (ii) Borrower shall not seek or pursue any other remedy, legal or equitable, against Marquette based in whole or in part upon contracting for, charging or receiving of any interest in excess of the Highest authorized by applicable law. For the purpose of determining whether or not any Excess has been contracted for, charged or received by Marquette, all interest at any time contracted for, charged or received by Marquette in connection with this Agreement shall be amortized, prorated, allocated and spread in equal parts during the full stated term of this Agreement. If, as a result of any circumstances whatsoever, fulfillment of any provision hereof or of any related agreement, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by applicable usury law, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity. The interest rate shall be computed on the daily Loan Balance from the date accrued until the date of payment and calculated on the basis of a 360-day year for the actual number of days elapsed.

The rate of interest payable hereunder shall not be less than the lesser of (i) Highest Legal Rate or (ii) six and one quarter percent (6.25%) per annum. Upon the occurrence of an Event of Default, the interest rate shall increase to the lesser of the Highest Legal Rate or Prime Rate, plus an additional six percent (6.0%) in excess of the then applicable interest rate. The Borrower acknowledges that the Prime Rate is not necessarily the lowest rate used or the lowest rate made available to customers by the Lender. Each change in the interest rate herein shall become effective on the day the corresponding change in the Prime Rate becomes effective. The undersigned acknowledges that Lender makes no representation that such prime rate is the lowest or best rate offered by Lender. In the event said bank shall no longer announce a prime rate, Lender shall select a rate comparable to said prime rate to be used in lieu thereof.

Section 2.06  Payment. All payments of principal and interest under the Revolving Loan hereunder shall be made to Lender in immediately available funds. Borrower agrees that the amount shown on the books and records of Lender as being the aggregate amount of Advances outstanding on the Revolving Loan shall be prima facie evidence of the principal amount of the Revolving Loan then outstanding.

Borrower will direct each of its account debtors to make payments due under the relevant Account or chattel paper directly to Lender, and shall immediately turn over to Lender any proceeds of such receivables, bills or Accounts collected by Borrower. Borrower hereby authorizes and directs Lender to deposit into a special collateral account to be established and maintained in Lender's name all checks, drafts and cash payments received from Borrower's account debtors. All deposits in said collateral account shall constitute proceeds of Collateral until credited against Borrower's obligations hereunder. Borrower shall immediately turn over to Lender any payments received by Borrower from account debtors. Payments received by Lender prior to 12:00 noon central time (Standard or Daylight as applicable) on each business day shall be applied against Borrower's obligations hereunder two (2) business days after receipt by Lender; until such application, the Account so paid shall continue to be included in the Borrowing Base. If any collection item, the amount of which has been credited against the Revolving Loan indebtedness, is subsequently dishonored or otherwise returned unpaid to Lender, Lender may debit Borrower's loan account for such amount, including any charges for dishonored items, retroactively to the date that the amount was credited against Borrower's obligations.

Section 2.07  Payment on Non-Business Days. Whenever any payment to be made hereunder or under the Revolving Loan shall be stated to be due on a Saturday, Sunday or a holiday for Lender under the laws of the State of Minnesota, such payment may be made on the next succeeding Lender business day, and such extension of time shall in such case be included in the computation of payment of interest on the Revolving Loan or the fees hereunder, as the case may be.

Section 2.08  Accounts. In order to qualify for inclusion in the Borrowing Base formulation, Accounts of the Borrower shall, at all times comply with the following criteria (Accounts so complying shall be referred to herein as "Qualified Receivables"):

(a)     The Account shall consist of a bona fide obligation arising out of shipments of goods in interstate or intrastate commerce;

(b)     The title of the Borrower to the Account is absolute and is not subject to any prior assignment, claim, lien or security interest;

(c)     The amount shown on the books of the Borrower and on a copy or schedule of any Accounts or statements delivered to Lender is owing to the Borrower, and no partial payment for which full credit has not been reflected has been made thereon by anyone;

(d)     The Account is not subject to any known: (i) claim of reduction, counterclaim, setoff, recoupment, or (ii) any claim for credits, allowances or adjustments by the account debtor because of damaged goods or unsatisfactory services, or for any other reason;

(e)     The Account is due and payable not more than thirty (30) days from the date of the invoice therefore;

(f)     The Account has not been outstanding more than ninety (90) days past the date of the original invoice (If twenty percent (20%) or more of the receivables of any customer of Borrower has been outstanding more than ninety (90) days past the date of the original invoice, the entire Account of such customer shall be deemed to be outstanding more than ninety (90) days past the date of the original invoice);

(g)     The Account does not arise out of a contract with, or order from an account debtor that, by its terms, forbids or makes the assignment of that Account to the Lender void or unenforceable;

(h)     The Borrower has not received any note, trade acceptance, draft or other instrument with respect to or in payment of the Account, or any chattel paper with respect to the goods giving rise to the Account, and, if any such instrument or chattel paper is received, the Borrower will immediately notify the Lender and, at Lender's request, endorse or assign and deliver the same to Lender;

(i)     Neither Borrower nor Lender has any notice of anything which might, in Lender's sole judgment, impair the credit standing of the account debtor;

(j)     The account debtor is not an affiliate of the Borrower;

(k)     Neither the Account nor the account debtor have been placed on Lender's non-purchase list;

(l)     In determining the Borrowing Base, all funds held by Borrower as advance deposits shall be deducted from the total amount of all Accounts.

Section 2.09  Collection of Accounts Receivable.  Borrower authorizes Lender to collect, and otherwise service all Borrower's Accounts.  All collection efforts shall be in Lender's sole discretion and nothing contained herein shall require Lender to process or collect any specific Account.

Section 2.10  Delivery of Accounts and Collection  The Borrower agrees to deliver to Lender at least once a week, all Accounts covering its shipments coming into its possession or to which it is a party for processing and collection under this Agreement.  Lender shall invoice the obligors on the Accounts and direct them to remit payment on such invoices to Lender at Marquette Transportation Finance, Inc., 1600  West 82nd Street, Suite 250, Bloomington, MN, 55431 or such other location as may be directed by Lender, or its successors or assigns.  Lender may also notify the account debtors that the Accounts have been assigned to Lender pursuant to this Agreement and direct the account debtor to pay and only pay Lender.

Section 2.11  Uncollectible Accounts.  If, after ninety (90) days from the date of first assignment, any Accounts remain uncollected, the Borrower agrees that Lender shall be released from any obligation to make further collection efforts or in any way service or process such Accounts and that such Accounts may be returned to the Borrower as uncollectible; provided, however, that any Accounts returned to Borrower shall remain subject to Lender's security interest and Borrower shall remit any proceeds of such Accounts to Lender for application in accordance with this Agreement.  As a part of its collection efforts, Lender is not required to institute legal proceedings on behalf of the Borrower to secure payment of the assigned Accounts.

Section 2.12  Payment Upon Demand.  All loans made by Lender to Borrower pursuant to this Agreement and all other Obligations which do not have a specific time for payment shall be payable on demand at any time and for any reason whatsoever, or without a reason, irrespective of whether or not an Event of Default shall have occurred and whether or not a termination of this Agreement shall have occurred.  Presentment or other demand for payment, notice of dishonor and protest are expressly waived.

Section 2.13  Appointments.  The Borrower appoints Lender, its agents, successors and assigns, as the Borrower's attorney with power to: (i) endorse the Borrower's name on any checks, drafts, or other forms of payment or security that may come into Lender's possession, (ii) sign the Borrower's name on notices of assignment, financing statements, and amendments under the Uniform Commercial Code, on verifications of Accounts and on notices to debtors; (iii) receive, open, and dispose of all mail addressed to the Borrower at Lender's address; (iv) send requests for verification of Accounts to debtors; and (v) do all things necessary to carry out this Agreement.  This power, being coupled with an interest, is irrevocable so long as any Account, or any obligation from the Borrower to Lender hereunder or under this Agreement remains unpaid.  The Borrower ratifies and approves all acts of Lender, its agents, successors and assigns, undertaken pursuant to this section.  Lender, its agents, successors and assign, will not be liable for any acts of commission or omission nor for any error in judgment or mistake of fact or law.

Section 2.14  Offset.  Upon the termination of this Agreement and payment of all of the

Obligations in full to Lender, Lender may retain up to one hundred thousand dollars ($100,000.00) from any monies then due from Lender to the Borrower for a period not to exceed one hundred twenty (120) days, as security for full payment of all the Borrower's Obligations, and all obligations, debts, claims or liabilities of any nature then owing, or thereafter found to be owing by the Borrower to Lender. The amount of all obligations, debts, claims, or liabilities shall then be deducted from any monies due the Borrower by Lender.

Section 2.15  Liability and Cargo Insurance.  The Borrower agrees to maintain liability and cargo insurance with coverage satisfactory to Lender in its discretion, and to provide Lender with a certificate of insurance confirming said coverage on or before January 1 and July 1 of each year and within ten (10) days of any written request from Lender to the Borrower for such confirmation.

Section 2.16  Service Fees.  The Borrower shall pay for services rendered by Lender hereunder in accordance with the Fee Schedule attached hereto as Exhibit A (the "Fee Schedule"). It is expressly understood that such charges may be increased or decreased by Lender or its President without notice and at any time and that such changes shall be and become a part of this Agreement as though set forth verbatim herein. In addition to such fees, Borrower shall promptly repay to Lender any actual costs incurred in the collection of Accounts which were not specifically provided for in the Fee Schedule.

## ARTICLE III
### Conditions of Lending

Section 3.01  Conditions Precedent to the Initial Advance.  The obligation of Lender to make its initial Advance on the Revolving Loan is subject to the condition precedent that Lender shall have received on or before the Commencement Date of the initial Advance all of the following, each dated (unless otherwise indicated) such day, in form and substance satisfactory to Lender:

(a)  This Agreement properly executed on behalf of the Borrower.

(b)  A certified copy of the resolutions of the Board of Directors, Partnership Agreements or Board of Governors , as applicable, of the Borrower evidencing approval of this Agreement and other matters contemplated hereby.

(c)  A signed copy of a certificate of the Secretary or an Assistant Secretary of the Borrower which shall certify the names of the officers, members or managing partners of the Borrower authorized to sign this Agreement and the other documents or certificates to be delivered pursuant to this Agreement by the Borrower or any of its officers, members or managing partners, together with the true signatures of such officers, members or managing partners. Lender may conclusively rely on such certificate until it shall receive a further certificate of the Secretary or Assistant Secretary of the Borrower canceling or amending the

prior certificate and submitting the signatures of the officers named in such further certificate.

(d)     A Certificate of Good Standing from the Secretary of State of Pennsylvania as to the Borrower and copies of the organizational documents and any Bylaws, member agreements or partnership agreements of the Borrower, certified by the Secretary or an Assistant Secretary of the Borrower as being true and correct copies thereof.

(e)     The Guaranty executed by Guarantor.

(f)     Borrower shall have paid a closing fee equal to Zero Dollars and No Cents ($0.00).

Section 3.02  Conditions Precedent to All Advances.  The obligation of Lender to make each Advance (including the initial Advance) shall be subject to the further conditions precedent that on the date of such Advance:

(a)     The representations and warranties contained in Article IV are correct on and as of the date of such Advance as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date;

(b)     No event has occurred and is continuing, or would result from such Advance, which constitutes an Event of Default or would constitute an Event of Default but for the requirement that notice be given or time elapse or both;

(c)     The Guaranty shall be in full force and effect;

(d)     Borrower shall have and retain a valid and current motor carrier's license and/or such other licenses or permits as are necessary to ship goods and operate its business.

ARTICLE IV
Representations and Warranties

The Borrower represents and warrants to Lender as follows:

Section 4.01  Corporate Existence and Power.  The Borrower is a corporation duly formed, validly existing and in good standing under the laws of Pennsylvania, and is duly licensed or qualified to transact business in all jurisdictions where the character of the property owned or leased or the nature of the business transacted by it makes such licensing or qualification necessary.  The Borrower has all requisite power and authority, corporate or otherwise, and has obtained all licenses and permits necessary to conduct its business, and to execute and deliver, and to perform all of its obligations under this Agreement.

Section 4.02  Validity of Accounts.  Borrower warrants that all Qualified Receivables submitted by Borrower for Advances hereunder pursuant to Section 2.01 hereof shall be genuine and in all respects what they purport to be, that Borrower has good and unencumbered title thereto; that Borrower has no knowledge of any facts impairing the worth or validity thereof; that the amounts set forth thereon are the true and correct amounts and that there are no offsets, counterclaims or deductions existing against the same.  Lender may verify Accounts at any time, and Borrower shall assist Lender in so doing.

Section 4.03  Authorization of Borrowing; No Conflict as to Law or Agreements.  The execution, delivery and performance by the Borrower of this Agreement and the borrowing from time to time hereunder have been duly authorized by all necessary corporate action and will not (i) require any consent or approval of the stockholders, members or partners of the Borrower, or any authorization, consent or approval by any governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, (ii) violate any provision of any law, rule or regulation or of any order, writ, injunction or decree presently in effect having applicability to the Borrower or to the organizational documents and any bylaws, member agreements or partnership Agreements of the Borrower, (iii) result in a breach of or constitute a default under any indenture or loan or credit agreement or any other agreement, lease or instrument to which the Borrower is a party or by which it or its properties may be bound or affected, or (iv) result in, or require, the creation or imposition of any mortgage, deed of trust, pledge, lien, security interest or other charge or encumbrance of any nature upon or with respect to any of the properties now owned or hereafter acquired by the Borrower.

Section 4.04  Legal Agreements.  This Agreement constitutes, when executed and delivered by the Borrower hereunder, a legal, valid and binding obligation of the Borrower enforceable against the Borrower in accordance with the respective terms.

Section 4.05  Subsidiaries.  The Borrower has no subsidiaries.

Section 4.06  Financial Condition.  The Borrower and Guarantor have heretofore furnished certain financial statements to Lender.  Said financial statements fairly represent the financial condition of the Borrower and Guarantor as of the dates thereof and the results of Borrower's operations for the periods then ended, and were prepared in accordance with generally accepted accounting principles.

Section 4.07  Adverse Change.  There has been no material adverse change in the business, properties or condition (financial or otherwise) of the Borrower of Guarantor since the date of the latest financial statement referred to in Section 4.06.

Section 4.08  Litigation.  There are no actions, suits or proceedings pending or, to the knowledge of the Borrower or Guarantor, threatened against or affecting the Borrower or the Guarantor or the properties of the Borrower or Guarantor before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which, if determined adversely to the Borrower or Guarantor, would have a material adverse effect on the financial condition, properties, or operations of the Borrower or Guarantor.

Section 4.09 <u>Taxes</u>.  The Borrower has filed all federal, state and local tax returns which to the knowledge of the officers of the Borrower are required to be filed, and the Borrower has paid or caused to be paid to the respective taxing authorities all taxes as shown on said returns or on any assessment received by it to the extent such taxes have become due.

Section 4.10 <u>Titles and Liens</u>.  The Borrower and Guarantor have good title to each of the properties and assets assigned to Lender pursuant to this Agreement free and clear of all liens and encumbrances of any kind and nature whatsoever.

Section 4.11 <u>Pension Program</u>.  No Reportable Event has occurred and is continuing with respect to any Plan.

Section 4.12 <u>Other Security Interests</u>.  Except as disclosed to Lender in writing, there are no security interests or liens against the property covering the Collateral.

ARTICLE V
<u>Affirmative Covenants of the Borrower</u>

So long as the Revolving Loan shall remain unpaid or the Revolving Loan shall be outstanding, the Borrower will comply with the following requirements, unless Lender shall otherwise consent in writing:

Section 5.01 <u>Financial Statements</u>.  In addition to the statements required pursuant to Section 5.03 below, the Borrower will deliver to Lender:

(a)     As soon as available, and in any event within one hundred twenty (120) days after the end of each fiscal year of the Borrower, company-prepared balance sheets and statements of income and expenses, all in reasonable detail, and in form and substance satisfactory to Lender and prepared by an independent public accountant in accordance with generally accepted accounting principles;

(b)     As soon as available and in any event within one hundred twenty (120) days after the end of each calendar year, the personal financial statement of assets and liabilities of each Guarantor, in reasonable detail, and in form and content satisfactory to Lender, prepared by an independent public accountant in accordance with generally accepted accounting principles;

(c)     Immediately after the commencement thereof, notice in writing of all litigation and of all proceedings before any governmental or regulatory agency affecting the Borrower or Guarantor of the type described in Section 4.07 or which seek a monetary recovery against the Borrower or Guarantor in excess of Five Thousand Dollars ($5,000.00);

(d)    As promptly as practicable (but in any event not later than five (5) business days) after an officer of the Borrower obtains knowledge of the occurrence of any event which constitutes an Event of Default or would constitute an Event of Default with the passage of time or the giving of notice, or both, notice of such occurrence, together with a detailed statement by a responsible officer of the Borrower of the steps being taken by the Borrower to cure the effect of such event;

(e)    Such other information respecting the financial condition and results of operations of the Borrower as Lender may from time to time reasonably request.

Section 5.02  Books and Records; Inspection and Examination.  The Borrower will keep accurate books of record and accounts for itself in which true and complete entries will be made in accordance with generally accepted accounting principles consistently applied and, upon request of Lender, will give any representative of Lender access to, and permit such representative to examine, copy or make extracts from, any and all books, records and documents in its possession, to inspect any of its properties and to discuss its affairs, finances and accounts with any of its principal officers, all at such times during normal business hours and as often as Lender may reasonably request.

Section 5.03  Collateral Records and Statements.  Borrower authorizes Lender to take all actions, in Lender's sole discretion, to collect Borrower's Accounts.  Lender shall have access to all records of Borrower, and may turn over to any institution providing financing to Lender, statements and reports containing all reasonable information and reports required by such institution, including, among other things, a weekly accounts receivable aging and daily information regarding which receivables are Qualified Receivables and which receivables are not Qualified Receivables, a classification of Accounts according to age, identifying those which are current, those which are less than thirty (30) days past due, those which are more than thirty-one (31) but less than sixty (60) days past due and a reconciliation of such aging of Accounts. Borrower shall cooperate with Lender in compiling and providing such information.

Section 5.04  Compliance with Laws.  The Borrower will comply with the requirements of applicable laws and regulations, the noncompliance with which would materially and adversely affect its business or its financial condition.

Section 5.05  Payment of Taxes and Other Claims.  The Borrower will pay or discharge all taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, or upon any properties belonging to it, prior to the date on which penalties attach thereto and all lawful claims for labor, materials and supplies which, if unpaid, might by law become a lien or charge upon any properties of the Borrower; provided, that the Borrower shall not be required to pay any such tax, assessment, charge or claim whose amount, applicability or validity is being contested in good faith by appropriate proceedings.

Section 5.06  Insurance.  The Borrower will obtain and maintain insurance with insurers believed by the Borrower to be responsible and reputable, in such amounts and against such risks

as is usually carried by companies engaged in similar business and owning similar properties in the same general areas in which the Borrower operates, including without limitation liability and cargo insurance, and shall provide Lender, upon Lender's request from time to time, with a certificate of insurance confirming the existence of such insurance.

Section 5.07 Preservation of Corporate Existence. The Borrower will preserve and maintain its existence as it is currently organized and all of its rights, privileges and franchises; provided, however, that the Borrower shall not be required to preserve any of its rights, privileges and franchises if its board of directors, partners or board of governors, as applicable, shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Borrower and that the loss thereof is not disadvantageous in any material respect to Lender as a holder of this Agreement. Borrower shall promptly notify Lender in writing prior to any change in Borrower's name or current organizational structure.

## ARTICLE VI
### Negative Covenants

So long as the Revolving Loan shall remain unpaid or Lender shall have any Revolving Loan hereunder, the Borrower agrees that, without the prior written consent of Lender:

Section 6.01  Sale of Assets. The Borrower will not sell, lease, assign, transfer or otherwise dispose of all or a substantial part of its assets (whether in one transaction or in a series of transactions) to any other Person.

Section 6.02 Consolidation and Merger. The Borrower will not consolidate with or merge into any entity, or permit any other entity to merge into it, or acquire (in a transaction analogous in purpose or effect to a consolidation or merger) all or substantially all the assets of any other entity.

Section 6.03 Restrictions on Nature of Business. The Borrower will not engage in any line of business materially different from that presently engaged in by the Borrower.

Section 6.04 Ownership Transfers. No part of the legal, beneficial, or equitable ownership of Borrower shall be changed by sale, conveyance, transfer, assignment, or encumbrance without the prior written consent of Lender.

## ARTICLE VII
### Events of Default, Rights and Remedies

Section 7.01 Events of Default. "Events of Default," wherever used herein, means any one of the following events:

(a)  Default in the payment of any interest on the Revolving Loan when it becomes due and payable or default in payment of the principal of the Revolving Loan when it becomes due and payable;

13

as is usually carried by companies engaged in similar business and owning similar properties in the same general areas in which the Borrower operates, including without limitation liability and cargo insurance, and shall provide Lender, upon Lender's request from time to time, with a certificate of insurance confirming the existence of such insurance.

Section 5.07 <u>Preservation of Corporate Existence</u>. The Borrower will preserve and maintain its existence as it is currently organized and all of its rights, privileges and franchises; provided, however, that the Borrower shall not be required to preserve any of its rights, privileges and franchises if its board of directors, partners or board of governors, as applicable, shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Borrower and that the loss thereof is not disadvantageous in any material respect to Lender as a holder of this Agreement. Borrower shall promptly notify Lender in writing prior to any change in Borrower's name or current organizational structure.

## ARTICLE VI
### Negative Covenants

So long as the Revolving Loan shall remain unpaid or Lender shall have any Revolving Loan hereunder, the Borrower agrees that, without the prior written consent of Lender:

Section 6.01  <u>Sale of Assets</u>. The Borrower will not sell, lease, assign, transfer or otherwise dispose of all or a substantial part of its assets (whether in one transaction or in a series of transactions) to any other Person.

Section 6.02 <u>Consolidation and Merger</u>. The Borrower will not consolidate with or merge into any entity, or permit any other entity to merge into it, or acquire (in a transaction analogous in purpose or effect to a consolidation or merger) all or substantially all the assets of any other entity.

Section 6.03 <u>Restrictions on Nature of Business</u>. The Borrower will not engage in any line of business materially different from that presently engaged in by the Borrower.

Section 6.04 <u>Ownership Transfers</u>. No part of the legal, beneficial, or equitable ownership of Borrower shall be changed by sale, conveyance, transfer, assignment, or encumbrance without the prior written consent of Lender.

## ARTICLE VII
### Events of Default, Rights and Remedies

Section 7.01 <u>Events of Default</u>. "Events of Default," wherever used herein, means any one of the following events:

(a)     Default in the payment of any interest on the Revolving Loan when it becomes due and payable or default in payment of the principal of the Revolving Loan when it becomes due and payable;

(b)     Any representation or warranty made by the Borrower in this Agreement or by the Borrower (or any of its officers) in any certificate, instrument, or statement contemplated by or made or delivered pursuant to or in connection with this Agreement, shall prove to have been incorrect in any material respect when made;

(c)     Default in the performance, or breach, of any covenant or agreement of the Borrower in this Agreement, provided, however, Borrower shall have 30 days after written notice by Lender to cure any defaults relating to the financial covenants set forth in this Agreement;

(d)     The Borrower or any Guarantor shall be adjudicated a bankrupt or insolvent, or admit in writing its inability to pay its debts as they mature, or make an assignment for the benefit of creditors; or the Borrower or any Guarantor shall apply for or consent to the appointment of any receiver, trustee, or similar officer for it or for all or any substantial part of its property; or such receiver, trustee or similar officer shall be appointed without the application or consent of the Borrower or any Guarantor and such appointment shall continue undischarged for a period of thirty (30) days; or a petition shall be filed by the Borrower or any Guarantor under the United States Bankruptcy Code naming the Borrower or any Guarantor as debtor thereunder or any such petition shall be filed against the Borrower or any Guarantor and shall remain pending for a period of thirty (30) days; or any judgment, writ, warrant of attachment or execution or similar process shall be issued or levied against a substantial part of the property of the Borrower or any Guarantor and such judgment, writ, or similar process shall not be released, vacated, stayed or fully bonded within thirty (30) days after its issue or levy;

(e)     The rendering against the Borrower or any Guarantor of a final judgment, decree or order for the payment of money in excess of Ten Thousand Dollars ($10,000.00) and the continuance of such judgment, decree or order unsatisfied and in effect for any period of thirty (30) consecutive days without a stay of execution;

(f)     Any Guarantor shall sell, transfer, convey, assign or otherwise dispose of any of his/her or its shares of stock in the Borrower (whether in one transaction or a series of transactions and whether voluntarily or involuntarily);

(g)     Any lien or encumbrance shall be filed against Borrower, or any property given as Collateral pursuant to this Agreement;

(h)     The filing of any local, state or federal tax lien against Borrower;

(i)     The failure to remit to Lender any payments for any Accounts received by Borrower; and

(j)    Any attempts by Borrower, other than as specifically requested by Lender, to collect Accounts from account debtors.

Section 7.02  <u>Rights and Remedies</u>.  Upon the occurrence of an Event of Default or at any time thereafter until such Event of Default is cured to the written satisfaction of Lender, Lender may exercise any or all of the following rights and remedies:

(a)    Lender may, by notice to the Borrower, declare the Revolving Loan to be terminated, whereupon the same shall forthwith terminate;

(b)    Lender may, by notice to the Borrower, declare the entire unpaid principal amount of the Revolving Loan then outstanding, all interest accrued and unpaid thereon, and all other amounts payable under this Agreement to be forthwith due and payable, whereupon the Revolving Loan, all such accrued interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower;

(c)    Lender may, without notice to the Borrower and without further action, apply any and all money owing by Lender to the Borrower to the payment of the principal amounts of the Revolving Loan then outstanding, including interest accrued thereon, and of all other sums then owing by the Borrower hereunder, all in such order as Lender shall determine; and

(d)    Lender may exercise and enforce its rights and remedies under this Agreement.

## ARTICLE VIII
### Miscellaneous

Section 8.01  <u>No Waiver; Cumulative Remedies</u>.  No failure or delay on the part of Lender in exercising any right, power or remedy hereunder or under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 8.02  <u>Amendments, Etc</u>.  No amendment, modification, termination or waiver of any provision of this Agreement or consent by the Borrower to any departure therefrom shall be effective unless the same shall be in writing and signed by Lender and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

Section 8.03  Addresses for Notices, Etc.  Except as otherwise expressly provided herein, all notices, requests, demands and other communications provided for hereunder shall be in writing and mailed or delivered to the applicable party at its address indicated below:

> If to the Borrower:
>
> Goodman Tank Lines, Inc.
> 463 Old Reading Pike
> Stowe, PA 19464
>
> If to Lender:
> Marquette Transportation Finance, Inc.
> 1600 West 82nd Street, Suite 250
> Bloomington, MN, 55431

or, as to each party, at such other address as shall be designated by such party in a written notice to the other party complying as to delivery with the terms of this Section.  All such notices, requests, demands and other communications shall, when mailed, be effective when deposited in the mails, addressed as aforesaid, except that notices or requests to Lender pursuant to any of the provisions of Article II shall not be effective until received by Lender.

Section 8.04  Costs and Expenses.  The Borrower agrees to pay on demand all costs and expenses of Lender in connection with the preparation of this Agreement and the other instruments and documents to be delivered hereunder and thereunder, including the reasonable fees and out-of-pocket expenses of counsel for Lender with respect thereto.  The Borrower further agrees to pay on demand all out-of-pocket expenses of legal counsel retained by Lender in connection with the enforcement of this Agreement and the other instruments and documents to be delivered hereunder and thereunder.  In the event any Lender personnel attend any proceeding in a court of competent jurisdiction, following an Event of Default hereunder, relating to enforcing any obligations of Borrower to Lender, Lender shall be entitled to a fee of Five Hundred Dollars ($500.00) per day plus all out of pocket expenses such as airfare, meals and hotel accommodations for such personnel plus the reasonable fees and out-of-pocket expenses of counsel for Lender.

Section 8.05  Early Termination Fee.  If for any reason this Agreement is terminated prior to the end of the then current term or renewal term of this Agreement, in view of the impracticality and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of Lender's lost profits as a result thereof, Borrower agrees to pay Lender, upon the effective date of such termination, an early termination fee in the amount set forth below if such termination is effective in the period indicated:

|  | **Amount** | **Period** |
|---|---|---|
| (i) | 3.0% of the Maximum Advance | from the date hereof to and including the first anniversary of the date hereof |

| (i) | 2.0% of the Maximum Advance | from the first anniversary of the date hereof to and including the second anniversary of the date hereof |
|---|---|---|
| (iii) | 1.0% of the Maximum Advance | from the second anniversary of the date hereof to but not including the third anniversary of the date hereof or after the third anniversary of the date hereof to but not including the end of any renewal term |

provided, that if all of the capital stock or substantially all of the assets of Borrower are sold in an arms' length transaction to a Person that is not an affiliate of Borrower prior to the second anniversary of the date hereof and in connection therewith either Borrower elects to prepay, or Lender requires the prepayment of the Advances the termination fee payable by Borrower in connection with such prepayment shall equal one percent (1%) of the Maximum Advance.

Such early termination fee shall be presumed to be the amount of damages sustained by Lender as a result of such early termination and Borrower agrees that it is reasonable under the circumstances currently existing.  The early termination fee provided for in this Agreement shall be deemed included in the Advances.

Section 8.06  Execution in Counterparts.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts of this Agreement, as the case may be, taken together, shall constitute but one and the same instrument.

Section 8.07 Binding Effect. Assignment.  This Agreement shall be binding upon and inure to the benefit of the Borrower and Lender and their respective successors and assigns, except that the Borrower shall not have the right to assign its rights hereunder or thereunder or any interest herein or therein without the prior written consent of Lender.  Lender may assign its rights and obligations under this Agreement.

Section 8.08 Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Minnesota.

Section 8.09 Jurisdiction.  Borrower agrees that the state and federal courts sitting in the State of Minnesota shall have exclusive jurisdiction to hear and determine any claims or disputes between the Borrower and Lender pertaining directly or indirectly to this Agreement, the indebtedness evidenced hereby, or to any matter arising therefrom and Borrower hereby waives any objection to the inconvenient forum.

Section 8.10 <u>Waiver of Trial by Jury</u>.  The Borrower and Lender each waives any right to a TRIAL BY JURY in any action to hear and determine any claims or disputes between Borrower and Lender pertaining directly or indirectly to this Agreement, the indebtedness evidenced hereby, or to any matter arising therefrom and Borrower agrees that any action or proceeding shall be tried before a Court and not before a Jury.

Section 8.11 <u>Severability of Provisions</u>.  Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

Section 8.12 Headings.  Article and Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

Goodman Tank Lines, Inc. (Borrower)

By: _____

Its: _____

STATE OF

§
§
COUNTY OF
§

The foregoing instrument was acknowledged before me this ____ day of _____, 201_, by _____ as _____ of _____.

Witness my hand and official seal.

My Commission expires:

**AGREED AND ACCEPTED**
this 6ᵗʰ day of November, 2014

**Marquette Transportation Finance, Inc.**

By: _____

Its: _____



# Marquette Transportation Finance

### Fee Schedule

Goodman Tank Lines, Inc
463 Old Reading Pike
Stowe, PA 19464

| Processing Fees | |
|---|---|
| Settlement by Wire Transfer | $15.00 per wire |
| Bill Service Fee | 0.40% of the face value of invoices submitted |
| Expedited Settlement (same day) | 0.80% of gross submissions |
| Direct Collect Penalty | 15% of amount direct collected/deposited |

Initial: _PCG._